UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLORENCE B. JACKSON,

     Plaintiff,

                                  Case No. 13-10710
v.                                    Hon. Laurie J. Michelson
                                    Mag. Judge Mona K. Majzoub

PNC BANK, N.A.,

     Defendant.

---

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [17] AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16]**

---

This district has seen its share of cases involving the foreclosure and sheriff's sale of a home. But the facts of this one are atypical. Plaintiff Florence Jackson's mortgage with Defendant PNC Bank, N.A. required Jackson to pay her property taxes through an escrow account held by PNC. For years this worked without issue. But in 2007, Jackson applied for a property tax exemption, which resulted in the City of Detroit taxing Jackson's property using two parcel identification numbers instead of one. For a two-year period following the exemption, both PNC and Jackson claim they were unaware of the second identification number. As a result, PNC did not collect from Jackson or pay the City of Detroit for the taxes associated with the unknown number. When the problem was finally corrected, PNC paid the delinquent taxes and then debited Jackson's escrow account for its payment. But this caused Jackson's required monthly payments to PNC to increase substantially, or, in Jackson's words, to "skyrocket[.]" Jackson avers that she could not make the suddenly-higher payments, and, as a result, defaulted

on her loan. Foreclosure ensued, and PNC bought Jackson's home at a sheriff's sale. Jackson then filed this lawsuit claiming, among other things, that PNC breached the mortgage by failing to pay the taxes associated with the second parcel identification number on time.

Both Jackson and PNC have moved for summary judgment. (Dkt. 16, Def.'s Mot. Summ. J.; Dkt. 17, Pl.'s Mot. Summ. J.) The Court has reviewed the briefing on the cross-motions and heard oral argument on June 19, 2014. Having been so advised, the Court concludes that, although PNC's failure to pay all the taxes on Jackson's home might have been avoided with greater diligence on Jackson's part, and while the connection between PNC's delinquent payment of the taxes and Jackson's default is tenuous, PNC has not shown that, as a matter of law, it did not have an obligation under the mortgage to pay all of Jackson's property taxes on time. Accordingly, and as detailed below, PNC is not entitled to summary judgment on Jackson's breach-of-contract claim. But PNC will be granted judgment in its favor on all of Jackson's other claims.

## I.  BACKGROUND

Many of the facts in this case are undisputed. Because each side has moved for summary judgment, where there are factual disputes, the Court presents each side's account.

In January 2004, pursuant to a promissory note ("Note"), Jackson borrowed $155,746.00 from non-party Continental Mortgage Corporation, U.S.A. (Dkt. 16, Def.'s Mot. Summ. J. Ex. B, Note.) Jackson, by executing a mortgage ("Mortgage"), agreed that if she broke her promise to repay, Continental could sell her house located at 2410 N. LaSalle Gardens, Detroit, Michigan ("Property"). (*See* Def.'s Mot. Ex. A, Mortgage.) A few days after Jackson executed the Note and Mortgage, Continental assigned the Mortgage to National City Mortgage Company. (Def.'s Mot. Ex. D, Assignment of Mortgage.) By way of merger, Defendant PNC Bank, N.A. is the

successor to National City Mortgage Company. (*See* Def.'s Mot. Ex. E.) The Court thus refers to both entities as "PNC."

In addition to principal and interest payments of $921.30, the Note and Mortgage required Jackson to make a monthly payment to PNC for "Escrow Items." (Mortgage ¶ 2.) Escrow Items, as defined in the Mortgage, included "taxes levied or to be levied against the Property." (Mortgage ¶ 2.) At closing, PNC, then the servicer of Jackson's loan, prepared an Initial Escrow Disclosure Statement, which estimated that Jackson would owe $2,066.03 to the City of Detroit for property taxes due in July 2004 and $542.11 for those due in January 2005. (Def.'s Mot. Ex. F.) Based on these estimates, and to cover other Escrow Items such as hazard insurance, Jackson was to pay $397.84 per month into an escrow account held by PNC. (*See* Mortgage ¶ 2, Def.'s Mot. Ex. F.) Thus, Jackson's total monthly payment to PNC was $1,319.14 for the first year. (Def.'s Mot. Ex. F.) Over the next several years, Jackson's monthly payment ranged from $1,319.14 to $1,505.15.

A seemingly innocuous event in 2007 ultimately resulted in this lawsuit. That year, Jackson applied for, and the State of Michigan granted, a Neighborhood Enterprise Zone Homestead Facility Certification ("NEZ Certification"). (Def.'s Mot. Ex. C, Jackson Dep. 20:5-24; Def.'s Mot. Ex. K, Application for Cert.) Michigan's Neighborhood Enterprise Zone Act provides tax exemptions for the development or rehabilitation of houses in certain neighborhoods. (Def.'s Mot. Ex. L, State of Michigan Dept. of Treasury, *Frequently Asked Questions, Neighborhood Enterprise Zone Act* at 1 (updated Aug. 16, 2010) [hereinafter NEZ FAQs].) An NEZ Certification not only lowers the homeowner's property taxes, it also changes how the City of Detroit taxes the property. More specifically, under the Act, an approved property is taxed as two separate parcels. (NEZ FAQs at 10.) After Jackson's NEZ Certification,

3

the original identification number set forth in the Mortgage, 10001322, corresponded to the land upon which Jackson's house sat ("Parcel 1"), while her house was assigned a new parcel identification number, 27073755 ("Parcel 2"). (*See* Mortgage at 2, Def.'s Mot. Exs. M, U.) The Michigan Department of Treasury's "Frequently Asked Questions, Neighborhood Enterprise Zone Act" advises those approved for a NEZ Certification that if their taxes are escrowed, they "may wish to notify" their mortgage company of the NEZ Certification. (NEZ FAQs at 12.)

Although challenged by PNC, Jackson did testify that she notified PNC of her NEZ Certification. In particular, Jackson said she called PNC customer service and obtained a fax number and then faxed her approval letter to PNC from a drug-store. (Jackson Dep. 28:18-29:9.) Jackson, however, gave conflicting reasons for needing to use the drug-store fax machine instead of the one she had at home (Jackson Dep. 29:14-14, 33:18-34:9), admitted that she was not completely certain that she received a fax confirmation (Jackson Dep. 31:14-24, 34:11-15), and said that if she did receive a confirmation, she doubted that she kept it (Jackson Dep. 31:25-32:1, 34:19-21). PNC, citing a "Collections/Customer Service Loan Activity Archive for the Time Period [October 1, 2008] thru [December 31, 2010]," asserts that "PNC's records and internal system notes do not reflect any communications from Plaintiff regarding the approval until June 2010." (Def.'s Mot. at 6-7 n.1, Ex. N.) But PNC's reliance on a loan-activity archive beginning in October 2008 overlooks the fact that Jackson received her NEZ Certification prior to July 2008 and testified that "[w]hen the state contacted me [about the approval], I contacted [PNC]." (Jackson Dep. 28:11-13.) In all events, PNC claims not to have had actual knowledge that the City of Detroit was taxing Jackson's land and house under separate identification numbers until June 2010.

4

In 2008, PNC provided CoreLogic, Inc., a company that it used to contact taxing authorities for the amount of taxes owed on properties for which PNC held escrow funds, with only Parcel 1's identification number. (*See* Def.'s Mot. at 3-4, 7; Def.'s Mot. Ex. I, Arthur Aff.) Based on CoreLogic's report of the amount of taxes owed for Parcel 1's identification number, PNC paid the City of Detroit only $32.28 for Jackson's July 2008 property taxes. (Def.'s Mot. Ex. O.) Because PNC had anticipated a much higher tax amount, $1,537.00, the lower payment triggered an automated escrow analysis. This analysis, apparently based on the prior two tax payments, projected a $1,642.17 escrow disbursement in December 2008 for taxes, but only a $32.28 disbursement in July 2009. (Def.'s Mot. Ex. H at 6.) As such, PNC reduced Jackson's total monthly payment from $1,550.15 to $1,347.54. (*Id.*) Jackson testified that when she received the escrow analysis she did not analyze the statement and instead assumed that PNC was paying her taxes: "[T]hey had paid my taxes from the time I purchased the house, and through FHA, my taxes are included in my mortgage, and I just didn't go through these documents with a fine-toothed comb. I would look at them and something might catch my eye and I would look at it more close[ly], but I assumed it was being taken care of." (Jackson Dep. 81:10-16.) When Jackson's property taxes came due in December 2008, essentially the same thing occurred: PNC, after providing CoreLogic with only Parcel 1's identification number, paid the City of Detroit only $34.80. (Def.'s Mot. Ex. P.)

Not unexpectedly, likely sometime in late 2008 or January 2009, Jackson received a notice from the City of Detroit providing that she had an over-$2,000 tax delinquency. (*See* Jackson Dep. 42:19-44:5, 44:18-21.) Jackson called PNC. (Jackson Dep. 43:5-6.) Jackson testified, "Verbatim, I cannot say [what I told them], but I did tell them that I received a letter stating that my taxes were delinquent and I assumed they were paying my taxes." (Jackson Dep.

43:8-10.) PNC does not indicate whether it undertook any investigation to determine why Plaintiff received such a delinquency notice. Instead, on January 27, 2009, it responded to Jackson's inquiry by sending Jackson a "Tax Payment Verification" letter. (Def.'s Mot. Ex. Q.) The letter provided, "Parcel Identification: 10001322" (which is the identification number for Parcel 1) and "Amount Last Paid: $34.80." (Def.'s Mot. Ex. Q; *see also id.* Ex. M, Mortgage at 2.) Jackson did not follow up with PNC after receiving this verification letter. (Jackson Dep. 44:18-45:4.)

On January 29, 2009, PNC ran an annual escrow analysis on Jackson's account. (Def.'s Mot. Ex. H at 8-9.) This analysis projected a $32.28 disbursement in July 2009 for property taxes and a $34.80 disbursement in December 2009. (*Id.*) Jackson testified that when she received this analysis indicating that PNC was anticipating her 2009 property taxes to be only $67.08, "I wasn't surprised, but I wondered why, and I didn't concern myself too much with it because the mortgage company, [National City], was paying my taxes and I assumed that they were paying them. . . . I was paying my mortgage, they were supposed to be paying the taxes, so I didn't worry myself too much about it." (*See* Jackson Dep. 46:17-47:1.) Based on the projections in the automated escrow analysis, Jackson's escrow account had a surplus, and, on January 29, 2009, PNC issued Jackson a $1,322.00 check for the surplus. (Def.'s Mot. Ex. H at 8, Ex. R.) Jackson testified that she was "surprised" by the escrow surplus but did not contact PNC because the reason for the surplus had been "outlined" in the escrow analysis. (*See* Jackson Dep. 77:1-21.) PNC also further reduced Jackson's total monthly payment to $1,172.26. (*See* Def.'s Mot. Ex. H at 6, 8.)

Consistent with the projections in the escrow analysis, PNC paid $33.68 in July 2009 for taxes and $36.30 in December 2009 for taxes. (Def.'s Mot. Exs. S, T.) PNC asserts that it was

still unaware that the City of Detroit had divided Jackson's property into two parts for property tax purposes. (*See* Def.'s Mot. at 10.) As of February 2010, Jackson's total monthly payment to PNC was $1,233.34. (Def.'s Mot. Ex. H at 10.)

Likely in late May or early June 2010, the Wayne County Treasurer's office sent Jackson another "Notice of Property Tax Delinquency." (Def.'s Mot. Ex. U.) The notice corresponds to "Parcel ID: 27073755," the parcel identification number for Parcel 2, and provides that Jackson owed $3,405.95 in taxes for 2008 and $3,111.64 for 2009. (*Id.*) On or around June 4, 2010, Jackson contacted PNC about the notice. (Jackson Dep. 49:16-51:3; Def.'s Mot. Ex. N.) PNC then added the second parcel identification number to its records, and, on June 11, 2010, paid the outstanding taxes and associated interest and fees. (*See* Def.'s Mot. Exs. N, V, W.) PNC then debited Jackson's escrow account for the amount it had paid, less $230.50 in interest and fees for the delinquent 2009 taxes (which it paid out of its own pocket). (*See* Def.'s Mot. at 11-12, Ex. G.)

On June 15, 2010, PNC ran an off-cycle escrow analysis. (Def.'s Mot. Ex. H at 12.) PNC projected a $36.30 tax disbursement for Parcel 1 in December 2010 and, for the first time, a $1,352.37 tax disbursement for Parcel 2. (*Id.*) PNC further projected a $33.68 tax disbursement for Parcel 1 in July 2011 and a $1,261.13 tax disbursement for Parcel 2. (*Id.*)

As a result of PNC's new projections and debiting Jackson's escrow account for its payment of the delinquent 2008 and 2009 taxes, Jackson's escrow account was short about $7,750. (*Id.*) Although PNC spread this shortage over a 12-month period, starting on August 1, 2010, Jackson's total monthly payment would be $2,065.29. (*Id.*) It had previously been $1,233.34. (*Id.*)

After PNC notified Jackson that her monthly payments had increased to $2,065, Jackson called PNC and also sent the bank a letter. (Jackson Dep. 61:4-25.) Jackson testified, "[W]hen [PNC] sent me the statement saying I'm to pay 2,000-and-something, I knew I couldn't pay it. So I made a payment, my regular payment, and tried to get this escrow money spread . . . out, and they said it couldn't be done. And I knew I could not pay over $2,000 per month, so . . . ." (Jackson Dep. 67:18-25.) Jackson also testified that she "sent a payment or two in," but PNC told her that it "couldn't apply [her payment]" because it "wasn't the total of 2,000-and-some dollars." (Jackson Dep. 72:19-24.)

PNC does not take a completely contrary position regarding Jackson's attempts to make her monthly payments after they increased to over $2,000. PNC says that Jackson did not make her monthly payment for August 2010, but paid $1,233.34 on September 1, 2010, and $2,563.04 on October 12, 2010. (Def.'s Mot. at 13-14, Ex. G.) Notably, the September payment was the amount Jackson had been paying prior to the escrow shortage. (Def.'s Mot. Ex. H at 10.) Likely at Jackson's request, in September 2010, PNC spread the escrow shortage over a longer, 48-month period which reduced Jackson's total monthly payment to $1,665.19 effective November 2010. (Def.'s Mot. at 14, Ex. H at 15; *see also* Jackson Dep. 62:10-63:20.) This amount is similar to the $1,550 that Jackson paid on a monthly basis prior to her NEZ Certification. (*See* Def.'s Mot. Ex. H at 6.) In February 2011, PNC ran another escrow analysis and Jackson's monthly payment was further reduced to $1,567.96 effective May 1, 2011. (Def.'s Mot. Ex. H at 17.) PNC says that after October 2010, Jackson attempted to make several "insufficient payments," but, by May 2011, "had stopped making payments altogether." (Def.'s Mot. at 14.) Although PNC has provided the Court with a loan transaction history, it is not apparent from that history how many more payments Jackson made after October 2010. (*See* Def.'s Mot. Ex. G.) Jackson,

however, does not dispute PNC's claim that she stopped making her monthly payments by May 2011. (*See generally*, Pl.'s Resp. to Def.'s Mot.)

Foreclosure followed. In November 2011, pursuant to Michigan Compiled Laws § 600.3205a, PNC sent Jackson a notice explaining why Jackson was in default, the amount she owed, the contact information for the mortgage holder or servicer, and a statement of her rights as a borrower. (*See* Def.'s Mot. Ex. Y at 3, 7.) Section 600.3205a provides that if a borrower makes a timely request to negotiate a loan modification, foreclosure proceedings cannot be initiated for 90 days. Mich. Comp. Laws § 600.3205a(d) (West 2011). Jackson made such a request, but the parties could not reach an agreement, and, in March 2012, PNC began publishing notices of foreclosure. (See Def.'s Mot. Ex. Y at 4.) On April 12, 2012, PNC purchased the Property at a sheriff's sale. (Def.'s Mot. Ex. Y at 1.)

Jackson filed this lawsuit against PNC on January 22, 2013. (Dkt. 1, Not. of Removal Ex. A, Compl.) Jackson's theory of the case can be simply stated: PNC was required to pay her property taxes on Parcel 2 on time, PNC failed to do so, PNC's failure led to her monthly payments "skyrocketing" to the point where she could not pay them, this in turn led to her default and, ultimately, the sale of her home. (*See* Compl. ¶¶ 5-8, 10, 13, 15-17, 26-27.) It also subjects her to potential liability for the deficiency remaining on her mortgage. Jackson says that this chain of events makes PNC liable in four ways: for breach of contract, for breach of fiduciary duty, for fraud and misrepresentation, and for unjust enrichment.

PNC says that it is entitled to judgment as a matter of law on each of these four causes of action. The Court agrees that Jackson's fiduciary duty, fraud, and unjust enrichment claims are legally deficient and, thus, need not be put to a jury. But PNC has not shown that Jackson's breach-of-contract claim fails as a matter of law.

9

## II. ANALYSIS

### A. Standards Governing Motions for Summary Judgment

Although both Jackson and PNC seek summary judgment, they must carry different burdens to succeed on their respective motions.

Because PNC seeks to dismiss claims that Jackson bears the burden of persuasion on at trial, PNC may discharge its initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [Jackson's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Hall v. Martin*, No. 1:10-CV-1221, 2014 WL 1403996, at *3 (W.D. Mich. Mar. 20, 2014) ("The moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial."). If PNC does so, Jackson "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of Jackson's claims to a jury, or whether the evidence is so one-sided that PNC must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to Jackson. *Matsushita*, 475 U.S. at 587.

Jackson's summary-judgment burden is considerably greater than PNC's. Because she seeks summary judgment on claims where she has the burden of persuasion, Jackson's showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for [her]." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under The Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)); *see also Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056

(6th Cir. 2001) ("[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" (quoting 11 James William Moore et al., *Moore's Federal Practice* § 56.13[1], at 56-138 (3d ed. 2000))). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to PNC. *Matsushita*, 475 U.S. at 587.

   With these standards in mind, the Court turns to the merits of Jackson's claims.

**B. Breach of Contract**

   Jackson asserts that PNC is liable for breach of contract because it violated paragraph 3 of the Mortgage. (Pl.'s Resp. to Def.'s Mot. at 3-4; Pl.'s Reply at 1-2; *see also* Pl.'s Mot. for Summ. J. at 2 ¶ 5.) That paragraph references paragraphs 1 and 2. (Mortgage ¶ 3.) As is sufficient for present purposes, those three paragraphs provide:

   1. Payment of Principal, Interest and Late Charge. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

   2. Monthly Payment of Taxes, Insurance and Other Charges. Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. . . . Except for the monthly charge by the Secretary [of Housing and Urban Development], these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

   Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act . . . .

   The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. . . .

11

3. Application of Payments. *All payments under paragraphs 1 and 2 shall be applied by Lender as follows*:

First, to the mortgage insurance premium to be paid by Lender to the Secretary [of Housing and Urban Development] or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

*Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required*;

Third, to the interest due under the Note;

Fourth, to amortization of the principal of the Note; and

Fifth, to late charges due under the Note.

(Mortgage ¶¶ 1-3 (emphases added).)

Although not well articulated, Jackson apparently believes that PNC breached the emphasized language because it failed to pay all of her 2008 and 2009 property taxes "in a timely manner": "The issue is that pursuant to the mortgage between Ms. Jackson and PNC, Ms. Jackson was required to make timely monthly payments to PNC and PNC was required to apply a portion of those payments in a timely manner to the property taxes and insurance on the subject property." (Pl.'s Resp. to Def.'s Mot. at 4 (emphasis added).) Jackson also states that the City of Detroit required property taxes to be paid on Parcel 2 before June 2010 and that "PNC did not do exactly what it was suppose[d] to do under the mortgage because the amount of property taxes it collected, held, and paid on Plaintiff's behalf were incorrect . . . ." (Pl.'s Reply at 1.)

PNC asserts that the Mortgage did not obligate it to "monitor the parcel identification number(s) assigned to the Property or otherwise conduct any investigation with respect to taxes assessed for the Property." (Def.'s Resp. to Pl.'s Mot. at 16-17.) Quoting from paragraphs 2 and 3 of the Mortgage, PNC asserts that, "[b]y its express terms the Mortgage required PNC only to 'collect and hold amounts for Escrow [I]tems' and to 'apply' those collected funds to Plaintiff's

property taxes." (Def.'s Reply at 1-2; *see also* Def.'s Mot. Summ. J. at 16 ("[T]he Mortgage merely provides that PNC may 'collect and hold' amounts for escrow items and 'apply' those funds to taxes, hazard insurance, and other defined escrow items." (quoting Mortgage ¶¶ 2, 3)).)

Assuming, as PNC believes, that the relevant language of the Mortgage is unambiguous, the Court is not convinced that its "plain sense and meaning" fails to support Jackson's breach-of-contract claim as a matter of law. *See City of Grosse Pointe Park v. Michigan Mun. Liab. & Prop. Pool*, 473 Mich. 188, 197-98, 702 N.W.2d 106, 113 (2005) ("The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate. In light of this cardinal rule, and to effectuate the principle of freedom of contract, this Court has generally observed that if the language of the contract is clear and unambiguous, it is to be construed according to its plain sense and meaning; but if it is ambiguous, testimony may be taken to explain the ambiguity." (citation, internal quotation marks, and alterations omitted)).

As an initial matter, the Court rejects PNC's plain-language interpretation of paragraph 3 because it ignores the order of operations set forth in that provision. PNC had to apply Jackson's monthly payments in a particular order: first to mortgage insurance premiums (or monthly charges by the Secretary), then to all taxes, and then to interest, principal, and late charges. (Mortgage ¶ 3.) The Note supports this plain reading of paragraph 3: "Each monthly payment of principal and interest will be in the amount of U.S. $921.30. This amount will be part of a larger monthly payment required by the [Mortgage], that shall be applied to principal, interest and other items *in the order described in the [Mortgage]*." (Note ¶ 4 (emphasis added).) Thus, PNC has oversimplified paragraph 3 in asserting, "[b]y its express terms the Mortgage required PNC only to 'collect and hold amounts for Escrow [I]tems' and to 'apply' those collected funds to Plaintiff's property taxes." (Def.'s Reply at 1-2.) Moreover, the record reveals that PNC did not

13

properly apply the payments according to this order—principal and interest payments were paid ahead of the taxes owing on Parcel 2 during 2008 and 2009.

The ordinary meaning of the language Jackson relies on, "All payments under paragraphs 1 and 2 shall be applied by Lender as follows: . . . <u>Second</u>, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required," could support Jackson's argument that PNC was obligated to pay the taxes on Parcel 2 on time. Starting with "as required," this phrase could mean "as called for as appropriate." *See* Webster's Third New International Dictionary, Unabridged, "require," *available at* http://unabridged.merriam-webster.com (last visited May 28, 2014) (providing one definition of "require" as "to call for as suitable or appropriate <the occasion *requires* formal dress>"). This reading of the phrase is consistent with the fact that property taxes were due only twice per year but paragraph 2 of the Mortgage required Jackson to include an amount for taxes in each monthly payment. (Mortgage ¶ 2.) Some months would not have called for PNC to apply Jackson's monthly payment to taxes—none were due or owing. Interpreting "as required" this way, PNC was obligated to apply Jackson's payments to "any taxes" as called for as appropriate, i.e., when they were due.

Turning to "any taxes," that phrase does not, on its face, exclude or discriminate against a particular type of tax. *See* Webster's Third New International Dictionary, Unabridged, "any," *available at* http://unabridged.merriam-webster.com (last visited May 25, 2014) (providing one definition of "any" as "one indifferently out of more than two: one or some indiscriminately of whatever kind: a: one or another: this, that, or the other . . . . b:  one, no matter what one: every"); *Karibian v. Vill. Green Mgmt. Co.*, No. 287165, 2010 WL 1138028, at *4 (Mich. Ct. App. Mar. 25, 2010) ("The commonly understood word 'any' generally casts a wide net and

14

encompasses a wide range of things. . . . 'Any' has been defined as 'every; all[.]'"). Even if the phrase "any taxes" was construed as "taxes, if any," the word "taxes," without more, does not exclude a particular tax. Notably, paragraph 3 does not say "known taxes" or "reasonably discoverable taxes." Instead, "taxes" is modified by "any."

Putting the above plain-meaning interpretations of the two phrases together, one reading of paragraph 3 that adheres to the plain language of that paragraph is that PNC had the obligation to apply Jackson's monthly payments to all taxes when they were due (after applying those payments to the mortgage insurance premium but before interest, principal, and late charges). As such, PNC has not shown that the unambiguous language of the Mortgage justifies a grant of summary judgment in its favor on Jackson's breach-of-contract claim.

PNC's second argument is effectively a rebuttal to this conclusion. PNC claims that its obligations under paragraph 3 were limited to taxes on Parcel 1: "The Mortgage further identified the subject Property by the property identification number ('PIN') for Parcel 1 only. The Mortgage does not provide that PNC is responsible to monitor or otherwise ensure that the property taxes are paid, particularly for a parcel not identified in the Mortgage." (Def.'s Reply at 2.) PNC further asserts: "There is no dispute that PNC did exactly what was required under the Mortgage—it collected and held monies for escrow items and applied those funds to the payment of all property taxes due for real property identified by PIN 100001322." (*Id.*)

This argument is not persuasive. As an initial matter, the definition of "Property" in the Mortgage is not limited to "real property identified by PIN 100001322":

> Borrower does hereby mortgage, warrant, grant and convey to the Lender, with power of sale, the following described property located in Wayne County, Michigan:
>
> LOT 169, LA SALLE GARDENS SUBDIVISION, AS RECORDED IN LIBER 25, PAGE 100 OF PLATS, WAYNE COUNTY RECORDS.

Parcel Number: WARD 100 ITEM 1322

which has the address of 2410 N. LaSalle Gardens [Detroit, Michigan 48206] ("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. *All of the foregoing is referred to in this Security Instrument as the "Property."*

(Mortgage at 2 (emphasis added).) The Mortgage thus defined the "Property" not only by its parcel identification number, but also by its plat and lot number. The definition further included "all the improvements now or hereafter erected on the property." Thus, the Court does not agree with PNC that because the Mortgage in part identified the Property using a parcel identification number, its obligation to apply escrow funds was limited to "real property identified by PIN 100001322."[1]

This conclusion is underscored by paragraph 2 of the Mortgage. That paragraph required Jackson to "include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for . . . taxes and special assessment levied or to be levied against the *Property* . . . ." (Mortgage ¶ 2 (emphasis added).) Again, the "Property" included all improvements on the land, including Jackson's house. And if Jackson had a duty under the Mortgage to include in her monthly payments an amount for taxes applicable to her house, then it would be a strained reading of paragraph 3 to say that PNC did not have an obligation to apply those very payments to taxes applicable to her house, i.e., Parcel 2.

_____

[1] PNC itself cites Michigan Compiled Laws § 560.255 (Def.'s Resp. to Pl.'s Mot. at 16 n.4); that statute provides: "When a subdivision plat has been recorded, the lots in that plat shall be described by the caption of the plat and the lot number for all purposes, including those of assessment, taxation, sale and conveyance."

To sum up, PNC believes that the language of the Mortgage is unambiguous. But PNC has not shown that the plain meaning of paragraph 3 did not obligate it to pay the 2008 and 2009 taxes on Parcel 2 on time. As such, the Court cannot say that Jackson's breach-of-contract claim fails as a matter of law.

But this does not mean that Jackson is entitled to summary judgment on her breach-of-contract claim. *See Beck v. City of Cleveland, Ohio*, 390 F.3d 912, 917 (6th Cir. 2004) (providing that on cross-motions for summary judgment, a court must "evaluate each motion on its own merits"). For one, Jackson's motion fails for the same reason that PNC's does. Although a plain reading of paragraph 3 could support her position, she has not demonstrated that there is no other proper reading of that paragraph. Indeed, Jackson offers no construction of the phrase "All payments under paragraphs 1 and 2 shall be applied by Lender as follows: . . . <u>Second</u>, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required." She merely quotes this language and leaves the interpretive task to the Court. This does not suffice to carry her summary-judgment burden.

Further, even if this Court was inclined to find breach as a matter of law, Jackson has not shown that all reasonable juries would find that her alleged damages were caused by PNC's breach. Under Michigan law, "causation of damages is an essential element of any breach of contract action." *Miller-Davis Co. v. Ahrens Constr., Inc.*, 495 Mich. 161, --- N.W.2d --- (2014); *see also Alan Custom Homes, Inc. v. Krol*, 256 Mich. App. 505, 512, 667 N.W.2d 379, 383 (2003) ("The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach."); *cf. Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854) ("Where two parties have made a contract which one of them has broken, the damages

17

which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it."). Jackson's Complaint provides only the conclusory statement that "PNC's action's resulted in an approximately $900.00 increase in Ms. Jackson's monthly payments, which caused her to default on a [$155,746.00 loan]." (Compl. ¶ 27.) Jackson's motion for summary judgment and reply brief in support of that motion do not do any better. In those briefs, Jackson claims—without citation to any evidence—that "PNC's failure to conf[o]rm to the contract requirements contributed to an escrow shortage that has caused Ms. Jackson a financial hardship which could result in her losing her home because of Defendant PNC's actions." (Pl.'s Mot. Summ. J. at 5; *see also* Pl.'s Reply at 1.)

Not only does Jackson fail to cite evidence supporting her claim that PNC's breach caused her default, some of the evidence suggests that it was Jackson's financial situation, rather than the actions of PNC, which led to her default. To be sure, Jackson testified that when her payments increased to over $2,000 per month, "I knew I couldn't pay it." (Jackson Dep. 67:18-25.) She also testified that she attempted to make further payments, but PNC would not apply them because they were not "the total of 2,000-and-some dollars." (Jackson Dep. 62:7-9.) On the other hand, Jackson acknowledged that just before her monthly payments increased to over $2,000, she had retired from her job. (Jackson Dep. 7:24-8:10.) This resulted in her income decreasing from about $3,200 per month to about $2,100 per month. (Jackson Dep. 8:11-10:13.) Moreover, even if PNC had simply required Jackson to start paying the correct amount of taxes beginning in August 2010 (never debiting Jackson's escrow account for the delinquent taxes),

18

Jackson's monthly payment would still have increased to about $1,400. (*See* Def.'s Mot. Ex. H at 12 (providing that monthly escrow payments necessary to cover projected taxes and insurance for August 2010 through July 2011 would be $485.33); Note at 1 (requiring monthly principal and interest payments of $921.30).) Jackson has offered no evidence that she was financially capable of making this lower, but required, payment. To the contrary, Jackson explained that, at some point she had sought a loan modification from PNC because "12 or 13 or 1600 [dollars] was quite a bit," and "if I could lower my payment, it would be easier on me." (Jackson Dep. 65:2-66:2.)

As noted, a plaintiff seeking summary judgment on a claim for which she carries the burden of persuasion at trial has the heavy burden of producing evidence so strong that any reasonable jury would be compelled to find in her favor. *Calderone*, 799 F.2d at 259; *Cockrel*, 270 F.3d at 1056. Even if Jackson had established PNC's breach of the Mortgage, Jackson has not proffered evidence of causation sufficient to carry that burden. On the record before the Court, a reasonable jury could find that Jackson defaulted on her loan because of her changed financial situation rather than PNC's delinquent payment of taxes. Accordingly, Jackson is also not entitled to summary judgment on her breach-of-contract claim.[2]

---

[2] Although the foregoing suffices to resolve the pending motions for summary judgment on Jackson's breach-of-contract claim, for the parties' benefit moving forward, the Court notes that the Mortgage may simply be ambiguous with regard to which party was primarily responsible for ensuring that all taxes on the Property were properly paid. Paragraph 2 says that Jackson had to "include in each monthly payment . . . a sum for . . . taxes and special assessment levied or to be levied against the Property," but arguably does not say that Jackson had to ensure that all taxes owed to the City of Detroit on the Property were paid in full and on time. Paragraph 3 says that PNC was to apply Jackson's monthly payment to "any taxes" on the Property, "as required," but arguably does not say that PNC had to ensure that all taxes owed to the City of Detroit on the Property were paid in full and on time. Thus, the Mortgage may simply be ambiguous. *See Shay v. Aldrich*, 487 Mich. 648, 678, 790 N.W.2d 629, 646-47 (2010) ("A contract is patently ambiguous only if, after the court has engaged in its judicial duties of giving effect to the contract's language, the court concludes that a term is *equally* susceptible to more

### C.  Breach of Fiduciary Duty

Jackson also maintains that PNC breached a fiduciary duty it owed to her when it failed to pay the 2008 and 2009 property taxes owed on Parcel 2 on time. (*See* Pl.'s Resp. to Def.'s Mot. at 5-6; Pl.'s Mot. at 6-7.) PNC counters that, under Michigan law, "no fiduciary duty arises out of the relationship between a lender and borrower." (Def.'s Mot. at 19.) Indeed, PNC quotes *Kevelighan v. Trott & Trott, P.C.*, 771 F. Supp. 2d 763, 779 (E.D. Mich. 2010), as follows: "'[N]o fiduciary duties arise within the lender-borrower context.'" (Def.'s Mot. at 18.)

This is not entirely accurate. *Kevelighan* in fact said, "*Generally*, no fiduciary duties arise within the lender-borrower context." 771 F. Supp. 2d at 779 (emphasis added). Indeed, under Michigan law, outside of the set of relationships "that automatically yield a fiduciary obligation" (trustees to beneficiaries, guardians to wards, attorneys to clients, and doctors to patients) "whether there exists a confidential relationship apart from a well-defined fiduciary category is a question of fact." *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1345 (E.D. Mich. 2011) (internal quotation marks and citation omitted); *accord Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 107 Mich. App. 509, 515, 309 N.W.2d 645, 648 (1981). On summary judgment then, the question is whether Jackson has produced enough evidence for a reasonable jury to find that PNC was Jackson's fiduciary. The answer is no.

Fiduciary relationships generally pertain "to 'relationships of inequality,' and situations where one person may exercise dominion over another." *Jason J. Armstrong, D.D.S., P.C. v.*

---

than a single meaning, or that two provisions of the same contract irreconcilably conflict with each other" (internal quotation marks and citations omitted)); *Martlew v. City of Benton Harbor*, No. 311897, 2014 WL 1778378, at *3 (Mich. Ct. App. May 1, 2014) ("'[W]hen a contract is incomplete because it fails to provide for a contingency, courts both at common law and under the Restatement may supply constructive conditions or "gap fillers" to avoid failure for indefiniteness.'"). Each side has thus-far presumed that the language is unambiguous, however, and so the Court sees no need for further analysis at this time.

*O'Hare*, No. 308635, 2014 WL 1614474, at *10 (Mich. Ct. App. Apr. 22, 2014); *see also In re Woods Estate*, 374 Mich. 278, 283, 132 N.W.2d 35, 39 (1965) (describing a fiduciary relationship as one where "'there is confidence reposed on one side, and the resulting superiority and influence on the other.'" (quoting 3 Pomeroy, *Equity Jurisprudence* § 956a (5th ed. 1941))). Thus, "a fiduciary relationship usually arises in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer." *London v. Glassford*, No. 306251, 2013 WL 85801, at *4 (Mich. Ct. App. Jan. 8, 2013) (citing *In re Estate of Karmey*, 468 Mich. 68, 75 n.2, 658 N.W.2d 796, 799 n.2 (2003)).

To be sure, Jackson did trust PNC to pay her property taxes. And, notably, PNC did so for years without issue. There was also some inequity in the parties' relationship regarding the payment of taxes. The Mortgage required Jackson to deposit funds for her taxes with PNC, and PNC had control over the disbursement of those funds. Further, the method that PNC used to determine how much Jackson owed in taxes was opaque to Jackson. Nothing suggests that PNC ever informed Jackson that, prior to June 2010, the amount it asked her to pay for taxes was based solely on its inquiry of Parcel 1's identification number.

On the other hand, Jackson had information available to her that reduced the inequity in the parties' relationship and made it unreasonable for Jackson to blindly trust PNC to properly pay her property taxes. The undisputed evidence shows that PNC regularly sent Jackson escrow analyses that set forth how much PNC anticipated paying the City of Detroit in taxes. (*See* Def.'s

21

Mot. Ex. H (2008, 2009, 2010 escrow analyses).)[3] Indeed, immediately after PNC paid only $32.28 for Jackson's July 2008 property taxes, PNC provided Jackson an escrow analysis indicating that, going forward, PNC would be collecting almost half as much for taxes on an annual basis ($1,674.45 as opposed to $3,179.55). (Def.'s Mot. Ex. H at 5.) And an escrow analysis about six months later showed that PNC planned to pay even less: only $32.38 for July 2009 taxes and $34.80 for December 2009 taxes. (Def.'s Mot. Ex. H at 8.) Although Jackson testified that she did not review the details of the escrow analyses and instead focused on her total monthly payment (Jackson Dep. 81:10-83:3), upon receiving the February 2010 analysis, Jackson marked the two projected tax payments of $33.68 and $36.30. (*See* Def.'s Mot. Ex. H at 10-11.) When asked why she then became concerned about the escrow projection, Jackson testified, "Because I was saying [']is this all they're paying?['] That's why. Now they said payment from the escrow. And I said, [']Is that all they're paying[']?" (Jackson Dep. 83:4-23.)

PNC also sent Jackson annual tax forms. (Jackson Dep. at 19:21-20:4; *see also* Def.'s Mot. Ex. AA, IRS Form 1098 for 2004, 2005, 2006, 2007, 2008).) These forms, although primarily conveying the amount of interest Jackson had paid on her mortgage, also provided the amount that PNC disbursed for property taxes over the prior year. (*See* Def.'s Mot. Ex. AA.) Jackson acknowledged using these forms to prepare her income taxes. (Jackson Dep. 19:21-20:4.) Yet the Form 1098 for 2007 indicates that PNC disbursed $3,179.55 for property taxes while the Form 1098 for 2008 indicates that PNC disbursed only $67.08 for property taxes. (Def.'s Mot. Ex. AA at 4-5.) A very noticeable drop.

Jackson also received notices regarding her delinquent taxes directly from the Wayne County Treasurer's office. Although copies of these notices are not part of the record, PNC has

---

[3] The Real Estate Settlement Procedures Act required PNC to provide Jackson with an escrow analysis on an annual basis. (*See, e.g.*, Def.'s Mot. Ex. H at 5.)

produced a printout from the Treasurer's database indicating that notifications regarding parcel identification number 27073755, the number for Parcel 2, were sent to Jackson in May and August 2009, and in January and May 2010. (Def.'s Mot. Ex. Z.) Notably, Jackson has produced no evidence indicating that PNC ever received notices about Jackson's delinquent taxes directly from the City of Detroit or from the Wayne County Treasurer's office. Thus, it was Jackson, not PNC, who was in the best position to know about tax delinquencies.

Moreover, the broader view of Jackson's and PNC's relationship suggests that it was not fiduciary in nature. As well stated by the court in *Kevelinghan*,

> The trust required by the underlying mortgage agreements is nothing more than is inherent in most contracts. At the executory stage of every contract, each party must, to a certain extent, trust the other to carry out his or her performance in compliance with the contract and the law. To the extent that any party breaches a contract or violates the law during performance, the other party may typically attempt to recover in a civil action for the alleged breach or violation, as plaintiffs are doing here. This does not mean that every contract gives rise to fiduciary duties amongst the parties.
>
> While the mortgage agreements in this case provide defendants some discretion in exercising their rights, they do not require that plaintiffs rely on defendants' judgment or advice in making their own decisions.

*Kevelighan*, 771 F. Supp. 2d at 779. "On these facts," the court concluded, "there is no reason to stray from the general rule that no fiduciary duties arise in the lender-borrower context and plaintiffs['] fiduciary duty claims are dismissed." *Id.*

So too here. The record indicates that Jackson was not uniformed about how much PNC was paying for taxes on the Property. Nor was she uninformed that taxes on Parcel 2 were delinquent. Moreover, the parties' broader relationship was not fiduciary in nature. In all, PNC is entitled to summary judgment on Jackson's breach-of-fiduciary duty claim.

### D. Fraud

Jackson's fraud claim is more readily disposed of. Jackson asserts that, via the Mortgage, PNC represented to her "that it would account for and pay for certain Escrow Items" and that she relied on "PNC's representations to account for and pay . . . those Escrow Items." (Pl.'s Resp. to Def.'s Mot. at 6; *accord* Pl.'s Mot. at 7-8.) According to Jackson, her reliance on "PNC's representation [has] resulted in a financial hardship which could result in her losing her home." (Pl.'s Mot. at 8.) Jackson relies on *Eaton Corp. v. Easton Associates, Inc.*, 728 F.2d 285 (6th Cir. 1984), in support of her fraud claim. (Pl.'s Resp. to Def.'s Mot. at 6.)

But *Eaton* sets forth elements of a fraud claim that Jackson has no evidence of. *Eaton* says that "[t]o sustain an action for common law fraud under Michigan law" Jackson must show, among other things, that "there was a material representation by [PNC] that was false" and, significantly, that PNC "knew that it was false when [it] made it or made it recklessly without any knowledge of its truth and as a positive assertion." 728 F.2d at 292 (citing *United States v. Cripps*, 460 F. Supp. 969, 975 (E.D. Mich. 1978); *Michael v. Jones*, 333 Mich. 476, 479, 53 N.W.2d 342 (1952); *McIntyre v. Lyon*, 325 Mich. 167, 170, 37 N.W.2d 903 (1949); 12 Michigan Law and Practice, Frauds § 1, at 390). Here, granting Jackson that, in the Mortgage, PNC represented that it would pay all of her property taxes "as required," nothing suggests that PNC or its predecessors in interest made that commitment recklessly or knowing that it was false. In hindsight, it turns out that PNC did not pay all of Jackson's property taxes on time. But, without more, that fact does not permit a reasonable jury to infer that PNC (or its predecessors) lacked the commitment to do so from the get go.

Jackson's fraud claim therefore fails as a matter of law.

24

### E.  Unjust Enrichment

Jackson's unjust enrichment theory is also faulty. She asserts that she "has been a loyal customer of Defendant for a number of years, paying her mortgage in a timely manner." (Pl.'s Mot. at 8.) "However," says Jackson, PNC "failed to pay [my] property taxes for 2008 and 2009 in a timely manner but continued to collect [my] mortgage payments." (*Id.*)

Assuming without deciding that Jackson can bring an unjust enrichment claim despite the existence of the parties' contractual relationship as established by the Note and Mortgage, *but see*, *Martin v. E. Lansing Sch. Dist.*, 193 Mich. App. 166, 178, 483 N.W.2d 656, 661 (1992), Jackson has not shown that PNC has been unjustly enriched. "[I]n order to establish a claim of unjust enrichment, [Jackson] must demonstrate: (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v. Bank of New York Mellon*, 300 Mich. App. 9, 23, 831 N.W.2d 897, 906 (2012). Jackson has not produced any evidence that PNC inequitably retained any of her payments. Jackson is correct that PNC did not pay the property taxes on Parcel 2 in 2008 and 2009 yet accepted her monthly payments during those years. But Jackson overlooks the fact that her monthly payments were reduced commensurate with the amount of property taxes that PNC in fact paid to the City of Detroit. As for PNC's eventual payment of the 2008 and 2009 property taxes, that too did not unjustly enrich PNC. There is no dispute that the amount PNC debited to Jackson's escrow account was the amount it paid to the City of Detroit (less the tax penalty for the delinquent 2009 taxes, which PNC paid from its own pocket).

25

In short, the proper unjust-enrichment inquiry does not turn on whether PNC's late payments damaged Jackson. It turns on whether PNC received an undue benefit from Jackson. Because Jackson has no evidence of that, her unjust enrichment claim fails as a matter of law.

### F.  Accounting

Jackson also brings a claim for accounting. (Compl. ¶¶ 54-59.) She says that there is a controversy over "the correct amount of money that is actually owed by Plaintiff to Defendant." (Compl. ¶ 55.)  She wants the Court to order PNC to make its books and records available so that a "certified public accountant and/or similarly qualified representative [can] audit the books and records." (Compl. ¶ 58.)

This claim fails as a matter of law. PNC is not seeking any money from Jackson, and her Complaint fails to plead any other reason for needing to know how much she owes PNC. (*See* Def.'s Mot. at 25.) Further, Jackson seems to have abandoned this claim: she has not moved for summary judgment on it (while moving on all other claims), and she has not responded to PNC's argument that it is entitled to summary judgment on her accounting claim. Finally, Jackson has not shown that she cannot obtain the information she seeks via ordinary discovery tools. *See Boyd v. Nelson Credit Centers, Inc.*, 132 Mich. App. 774, 779, 348 N.W.2d 25, 27 (1984) ("An accounting is unnecessary where discovery is sufficient to determine the amounts at issue."). As such, PNC is entitled to judgment as a matter of law on Jackson's demand for accounting.

## III. CONCLUSION AND ORDER

In sum, PNC has asserted that the Mortgage, at least insofar as it pertains to Jackson's escrow payments and PNC's duty to disburse those payments, is unambiguous. But PNC has not demonstrated that a plain-language approach to the Mortgage shows, as a matter of law, that it did not have an obligation to pay all of the taxes on the Property on time. Accordingly, PNC has

26

not adequately demonstrated that Jackson's breach-of-contract claim fails as a matter of law. On the other hand, Jackson has not shown that, as a matter of law, the Mortgage required PNC to pay all of her property taxes on time. Moreover, Jackson has not shown that all reasonable juries would find that PNC's failure to pay the taxes on time caused her default. Thus, neither party is entitled to summary judgment on Jackson's breach-of-contract claim. As for Jackson's other claims, for the reasons stated, they fail as a matter of law.

Accordingly, the Court DENIES Jackson's Motion for Summary Judgment (Dkt. 17) and GRANTS IN PART PNC's Motion for Summary Judgment (Dkt. 16). PNC is entitled to judgment in its favor as a matter of law on Counts II, III, IV, and V of the Complaint. The sole remaining claim in this case is Count I, Jackson's breach-of-contract claim.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  June 30, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 30, 2014.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson

27